(No. 43240.—

ELIZABETH NITZE PAEPCKE *et al.*, Appellants, *vs.* THE
PUBLIC BUILDING COMMISSION OF CHICAGO *et al.*, Appellees.

*Opinion filed September 29, 1970.*

CALVIN SAWYIER and RICHARD L. WEXLER, both of Chicago, for appellants.

RICHARD L. CURRY, Corporation Counsel, of Chicago, for appellee City of Chicago.

WILLIAM R. DILLON, of Chicago, for appellee Public Building Commission of Chicago.

JAMES W. COFFEY and JOHN T. MEHIGAN, both of Chicago, for appellee Board of Education of the City of Chicago.

NEIL F. HARTIGAN and HARRY R. POSNER, both of Chicago, for appellee Chicago Park District.

GEORGE E. BULLWINKEL and RICHARD STILLERMAN, both of Chicago, (GEORGE W. OVERTON and MARSHALL PATNER, of counsel,) for *amicus curiae*.

Mr. JUSTICE BURT delivered the opinion of the court:

Plaintiffs, who are citizens, residents, taxpayers and property owners of the city of Chicago appeal from an order of the circuit court of Cook County dismissing their complaint by which they sought to prevent defendants, Public Building Commission of Chicago, the City of Chicago, the Board of Education of Chicago and the Chicago

Park District from implementing plans to construct school and recreational facilities in Washington and Douglas parks. This court has jurisdiction on direct appeal because of the constitutional questions involved.

The facts are to be gathered from statements in the complaint which are admitted by defendants' motion to dismiss and from joint exhibits admitted into evidence at the request of all of the parties. In 1869 the General Assembly passed "An Act to Provide for the Location and Maintenance of a Park for the Towns of South Chicago, Hyde Park and Lake" which was approved and in force February 24, 1869. (Private Laws, 1869, vol. 1, p. 358.) The statute provided that five persons, to be appointed by the Governor, be constituted a board of public park commissioners for the towns in question to be known as the "South Park Commissioners". The act authorized the commissioners to select certain lands which are specifically described by metes and bounds and provided in section 4 thereof that the lands "when acquired by said Commissioners, as provided by this act, shall be held, managed and controlled by them and their successors, as a public park, for the recreation, health and benefit of the public, and free to all persons forever." Pursuant to the granted authority the commissioners proceeded to acquire, among other lands, those which presently constitute Washington Park which is now held by the Chicago Park District as successor to the South Park Commissioners. The deeds by which the property was originally acquired by the commissioners purport to convey an unrestricted title in fee simple without mention of park usage. Washington Park as presently constituted contains 371 acres. It is located on the south side of the city of Chicago and is bounded by 51st Street on the north, Cottage Grove Avenue on the east, 60th Street on the south and Martin Luther King Drive on the west.

In 1869, the same year in which the South Park Commission was created, the General Assembly passed an act

entitled "An Act to amend the charter of the city of Chicago, to create a board of Park Commissioners, and authorize a tax in the town of West Chicago, and for other purposes", approved and in force February 27, 1869. (Private Laws of 1869, vol. 1, p. 342.) By this legislation a board of public park commissioners to be known as "The West Chicago Park Commissioners" was created with power and authority to acquire certain designated lands with the stipulation in section 5 thereof "that said board shall have power, and it is made their duty and they are hereby authorized to select and take possession of, and to acquire by condemnation, contract, donation or otherwise, title forever in trust for the inhabitants, and for the public, as public promenade and pleasure grounds and ways." After their appointment by the Governor the commissioners acquired, among other lands, those which now constitute Douglas Park, presently held by the Chicago Park District as successor to the West Chicago Park Commissioners. This park, consisting of 181.99 acres, is situated on the west side of the city of Chicago bounded on the north by Roosevelt Road, on the east by California Avenue, on the south by 19th Street and on the west by Albany Avenue. The land comprising this park was acquired by 10 deeds, six originals and two reconstructions of which were received in evidence. The remaining deeds were not found in the records of the recorder due to the Chicago fire. Each of the six originals admitted was on the same printed deed form and contained the same restrictive language as that found in section 5 of the act as above quoted. In two of these the restrictive language had been crossed out. In the remaining four it had been unaltered. No restrictions appear in the reconstructed deeds.

The Public Building Commission of Chicago, at the request of the Board of Education of the City of Chicago has undertaken a program involving the construction, alteration, repair, renovation and rehabilitation of public schools in the city, together with park, recreational, play-

ground and other related public facilities which will be leased by the Building Commission to the Board of Education, the Chicago Park District and other governmental agencies. The commission has selected, located and designated sites within the territorial limits of the city of Chicago as sites to be acquired for the erection and construction of elementary, middle and high schools to serve about 30,000 pupils, together with park, recreational and playground facilities. Each of the sites has been recommended by the Department of Development and Planning of the City of Chicago in accord with the comprehensive plan for the city of Chicago and in cooperation with the Board of Education of the City of Chicago and also the Chicago Park District in connection with the sites in which the Chicago Park District is involved. Some of these sites have already been approved by the city council of the city of Chicago.

A site has been designated in Washington Park for the erection of a school-park facility. The Chicago Park District proposes to convey to the Public Building Commission of Chicago for such purposes a total of 3.839 acres located in the northwest portion of the park about 250 feet from the northern boundary. On 2.586 acres of this site the building commission proposes to construct a middle school for approximately 1500 students to be leased to the Board of Education of the City of Chicago. The remaining 1.253 acres would be utilized in the construction of a gymnasium and recreational facilities which will be leased to the Chicago Park District. Construction had started on this site at the time suit was filed but had not proceeded to a point where original use of the land would no longer be possible. Of the sites thus far selected by the Public Building Commission of Chicago and approved by the city council of the city of Chicago only the 2.6 acres in Washington Park involves property in a park which is to be used for school construction. No site has been designated in Douglas Park

but one is under consideration at the present time.

Plaintiffs' complaint alleges a class action brought on behalf of three classes of citizens: (1) those named who are citizens, residents and taxpayers of the city of Chicago; (2) those named who are citizens, taxpayers and residents of areas of the city served by a large regional city park such as Washington Park and (3) those named who are citizens, taxpayers and residents of an area served by a large regional city park, such as Washington Park, and who own real property bordering on or in the immediate vicinity of said park in respect to which there is a plan to construct a schoolhouse within the boundaries of such park. It is plaintiffs' theory that the parks in question are so dedicated that they are held in public trust for use only as park or recreational grounds and that those of them who are property owners adjacent to or in the vicinity of a park dedicated by the acts of 1869 have a private property right to the continuation of the park use of which even the legislature cannot deprive them. They further contend that all plaintiffs who are citizens and residents of any area of the city have a public property right to enforce the public trust existing by reason of the dedication of the parks as aforesaid and to require that no change of park use be permitted because the legislature has not explicitly and openly so provided by statute. Additionally, plaintiffs contend that the Public Building Commission Act does not authorize construction by the commission of local school houses in Chicago's regional parks under the plan proposed by defendants and that controlling statutes make this scheme invalid for both the Board of Education and the Chicago Park District. Finally, it is alleged that the Public Building Commission Act is unconstitutional as being too vague and indefinite.

In sustaining defendants' motion to dismiss the complaint the trial court, in its judgment order, rejected all of plaintiffs' contentions and specifically found that plaintiffs in each of the three classifications asserted had no such

interest in Washington Park or Douglas Park sufficient to enable or entitle them, or any of them, to maintain the action "except as taxpayers."

We think it is clear from the undisputed facts in this case that there has been a dedication by the General Assembly of the lands in question for use as public parks. This is so notwithstanding the fact that the deeds by which the South Park Commissioners and the West Chicago Park Commissioners obtained title did or did not contain any of the restrictive language found in the legislative enactments. The authority of the commissioners in either case to receive title existed solely by virtue of the provisions of the statutes which created the respective municipal bodies for the sole purpose of acquiring the lands for the purposes specified. Both acts in substance specified that the lands when acquired should be devoted to park purposes though the language was not the same in each case. Such a dedication having been made by the sovereign, the agencies created by it hold the properties in trust for the uses and purposes specified and for the benefit of the public. See: *Illinois Central Railroad Co.* v. *Illinois,* 146 U.S. 387, 36 L. Ed. 1018, 13 S. Ct. 110; *Bliss* v. *Ward,* 198 Ill. 104, 115; Sax, "The Public Trust Doctrine in Natural Resource Law: Effective Judicial Intervention," 68 Mich. Law Rev. 471-566.

In his extensive discussion of the "public trust doctrine" in the article just cited, the author, Professor Joseph L. Sax, had occasion, at pps. 489-491, to analyze the decision in *Illinois Central Railroad Co.* v. *Illinois,* 146 U.S. 387, which he refers to as "The Lodestar of American Public Trust Law". According to this authority the central substantive thought in public trust litigation as derived from this case is: "When a state holds a resource which is available for the free use of the general public, a court will look with considerable skepticism upon *any* governmental conduct which is calculated *either* to reallocate that resource to more restricted uses *or* to subject public uses to the self interest

of private parties". However, in discussing the question whether the government can or should be viewed as having made any irrevocable commitments about the use of particular governmental resources, *i.e.* whether any formal governmental acts can accomplish the result of changing or abolishing the use (and observing that the question had apparently never been adjudicated with respect to national parks) the author says, at p. 482 : "To accept such claims of property rights would be to prohibit the government from ever accommodating new public needs by reallocating resources. Certainly any such notion strikes at the very essence of governmental power, and acceptance of such a theory by a court would be as unwise as it is unlikely. It is important to recognize that the assertion of a taking is not a mere claim to compensation, for the objectors do not want cash; rather, it is a claim that when a resource is dedicated to public use, that dedication is irrevocable. However strongly one might feel about the present imbalance in resource allocation, it hardly seems sensible to ask for a freezing of any future configuration of policy judgments, for that result would seriously hamper the government's attempts to cope with the problems caused by changes in the needs and desires of the citizenry". Finally, in discussing the state of the authorities on the question, the author says at p. 485-486 : "One who searches through the reported cases will find many general statements which seem to imply that a government may never alienate trust property by conveying it to a private owner and that it may not effect changes in the use to which that property has been devoted". Then, after examining quotes from two cases, the author continues. "But a careful examination of the cases will show that the excerpts just quoted and almost all other such statements are dicta and do not determine the limits of the state's legitimate authority in dealing with trust lands. Unfortunately, the case law has not developed in any way that permits confident assertions about the outer limits of state

power. Nonetheless, by examining the diverse and often loosely written opinions dealing with public lands, one may obtain a reasonably good picture of judicial attitudes".

With this much of background we approach the first question presented in this appeal: Have plaintiffs who are property owners adjacent to or in the vicinity of the parks dedicated by the acts of 1869 a private property right to continuation of the park use of which even the legislature cannot deprive them? This question must be answered in the negative. The mere dedication by the sovereign of lands to public park uses does not give property owners adjoining or in the vicinity of the park the right to have the use continue unchanged even though, when the park was established, abutting or adjoining owners were assessed for special benefits conferred. (*Reichelderfer* v. *Quinn,* 287 U.S. 315, 77 L. Ed. 331, 53 S. Ct. 177.) In the cited case Rock Creek Park in the District of Columbia had been created by act of Congress providing that the lands "were perpetually dedicated and set apart as a public park or pleasure ground for the benefit and enjoyment of the people of the United States". A later act of Congress authorized the Commissioners of the District of Columbia to construct a fire engine house in the park. The Supreme Court held that the plaintiffs derived no rights against the government and had no interests protected by the constitution against diminution by the government, however unreasonable its action might be. Also, as far as the private rights of adjoining owners are concerned, see: *Thayer* v. *City of Boston,* 206 Fed. 969, (schoolhouse in park) ; *Fielding* v. *Board of Education of Paterson,* 76 N.J. Super. 50, 183 A. 2d 767, (schoolhouse in park) ; *Carlson* v. *City of Freemont,* 180 Neb. 262, 142 N.W.2d 157, (fire station in park) ; *Stevens* v. *Mayor and Council of City of Vinita* (Okla. 1957), 315 P.2d 776, (fire station in park). As to rights of adjoining owners in lands devoted to public uses generally see: *Horn* v. *City of Chicago,* 403 Ill. 549; *Doane* v. *Lake Street Ele-*

*vated Railroad Co.,* 165 Ill. 510; *Stetson* v. *Chicago and Evanston Railroad Co.,* 75 Ill. 74.

In asserting a private property right plaintiffs cite *South Park Commissioners* v. *Montgomery Ward & Co.,* 248 Ill. 299; *City of Jacksonville* v. *Jacksonville Railway Co.,* 67 Ill. 540 and *Nichols* v. *City of Rock Island,* 3 Ill.2d 531. None of these cases fairly supports plaintiffs' contention.

*South Park Commissioners* v. *Montgomery Ward & Co.,* is the last of a long line of cases wherein the owners of property on the west side of Michigan Avenue in the city of Chicago were able to prevent the construction of buildings in Lake Front Park (later Grant Park). A reference to some of the earlier cases, especially *City of Chicago* v. *Ward,* 169 Ill. 392, 397-398, shows that the legislature, by act creating the city of Chicago, provided that no encroachments should be made on any land or water west of a line 400 feet east from the west line of Michigan Avenue and parallel thereto, and that any person being an owner of any lot fronting on Michigan Avenue should have the right to enjoin the company (the railroad) and all other persons and corporations from violations of the section of the statute in question and in his or their own name or otherwise enforce the provisions of said ordinance (which defined railroad's rights) and this section and recover damages *etc.* There were to be no encroachments without consent of all owners. It thus appears that the adjoining owners in these cases had a "built in" cause of action and special property rights given by statute. In *South Park Commissioners* v. *Montgomery Ward & Co.,* the holding is that the interests held by these adjoining owners could not be condemned because it would amount to a taking of private property for an illegal use. In this case there is no showing that plaintiffs have any special property rights or interests by contract or otherwise. On the contrary the allegation is only that they own property adjacent to or in the vicinity of the parks. The *South Park Commissioners* case is therefore clearly

distinguishable. In the *Jacksonville* case no question was raised or passed upon relative to the private rights of property owners abutting on the square or park. The action was brought by the city to restrain the railroad from extending its trackage through the square, and the holding is that the legislature had no right to give the railroad rights which were contrary to the terms of dedication by the original grantors. This court held that the injunction requested by the city should have been issued. Any statement or inference that the abutting owners had special property rights is pure *dictum*. As to the *Nichols* case, no legislative action is involved and therefore no issue is presented as to abutting owners being deprived of their property rights by legislative action. It further appears that plaintiffs claimed a perpetual easement by way of a special property right. As already indicated, no such claim is made here. This court decided in the *Nichols* case that the construction of a swimming pool, bath house and parking lot in the park in question was consistent with the public uses intended.

The second question is whether all of plaintiffs, including citizens who are residents of any area of the city, have a public property right to enforce the public trust here and to require that no change of park use be permitted because the legislature has not explicitly and openly so provided by statute. If we understand plaintiffs' position correctly they do not contend, as far as the rights of the public in public trust lands are concerned, that the legislature could never, by appropriate action, change or reallocate the use in any way. (This would be contrary to well established precedent. See: *Droste* v. *Kerner,* 34 Ill.2d 495; *People ex rel. Moloney* v. *Kirk,* 162 Ill. 138; *People ex rel. Bransom* v. *Walsh,* 96 Ill. 232, 250.) Plaintiffs argue, rather, that before such change can be said to have taken place there must be explicit and open action by the legislature authorizing such a diversion.

As to the first part of the question, *i.e.*, the interests of

plaintiffs and their standing to bring the action, the trial judge found that they had no rights sufficient to enable them to maintain the action "except as taxpayers". In *Droste* v. *Kerner*, 34 Ill.2d 495, 504, this court held that an individual taxpayer or property owner, in the absence of statutory authority conferring that right, had no standing in equity to enjoin an alleged misuse of property held in trust for the public unless he alleges and proves that he will suffer special damage, different in degree and kind from that suffered by the public at large. There was a dissent in the *Droste* case in which it was pointed out that the alleged cause of action in such cases is based upon the individual's status as a taxpayer and that it is his equitable interest, as a taxpayer, in the public property which he claims is being illegally disposed of that determines his standing to maintain the action; that his right to sue does not depend on any injury to his property and that he should not be forced to rely solely upon the efforts of public law officers for the protection of public rights. Authorities were cited to support this position and distinctions were observed as to the authorities relied upon by the majority. Upon serious reconsideration of this question we now believe that portion of the opinion in *Droste* dealing with the right and standing of the plaintiff to sue should be overruled, as should any other former decisions of this court holding that a citizen and taxpayer has no right, in the absence of statute, to bring an action to enforce the trust upon which public property is held unless he is able to allege and prove special damage to his property. If the "public trust" doctrine is to have any meaning or vitality at all, the members of the public, at least taxpayers who are the beneficiaries of that trust, must have the right and standing to enforce it. To tell them that they must wait upon governmental action is often an effectual denial of the right for all time. The conclusion we have reached is in accord with decisions in other jurisdictons, see: *e.g. Robbins* v. *Department of Public Works,* 355 Mass. 328,

244 N.E.2d 577, and *Gould* v. *Greylock Reservation Com.*
350 Mass. 410, 215 N.E.2d 114, wherein plaintiffs' rights
as residents in a trust of public lands were enforced with-
out question.

As to the second part of the question, *i.e.,* whether there
has been a sufficient manifestation of legislative intent to
permit the diversion and reallocation contemplated by the
plan proposed by defendants, it should be remembered that
in *People ex rel. Stamos* v. *Public Building Com.,* 40 Ill.2d
164, this court had before it the very plan and program here
involved which was examined in detail in the light of the
many constitutional objections raised. Our conclusion was
that the plan was valid and not subject to any of the objec-
tions urged. The only question of major importance not
before us in *Stamos* which is present here is that of alleged
illegal diversion of use which plaintiffs claim is without
statutory authority. In our opinion in *Stamos* we examined
with some care the provisions of the original Public Build-
ing Commission Act of 1955 (Ill. Rev. Stat. 1955, ch. 34,
pars. 256-279); the Public Building Commission Act as
amended in 1965 (Ill. Rev. Stat. 1967, ch. 85, pars. 1031-
1054) particularly sections 3 and 14(c) (pars. 1033 and
1044); the 1955 amendment to the School Code (Ill. Rev.
Stat. 1955, ch. 122, par. 34—20a, now par. 34—21.1); the
1957 amendment to the School Code (Ill. Rev. Stat. 1957,
ch. 122, par. 15—22) and the 1955 amendment to the Park
District Act (Ill. Rev. Stat. 1955, ch. 105, par. 333.15a)
and concluded that these statutes evidenced an intention on
the part of the General Assembly to authorize the improve-
ment of the site there in question with a complex of school,
park and recreational facilities for the full utilization of
such property for the benefit of the school children during
the school terms and hours, and for the general public at
other periods. In other words, we found that the applicable
statutes authorized the program of schools and recreational
facilities in parks which is now sought to be implemented in

Washington and possibly in Douglas Park by the defendants here.

Plaintiffs argue nevertheless that before defendants can be allowed to carry out their plan the legislature must clearly and specifically state with reference to the park or parks in question explicit authority to divert to new public uses and that there must appear in that legislation not only a statement of the new use but a statement or recital showing in some way an awareness on the part of the legislature of the existing public use. Their position is based mainly upon a line of Massachusetts cases including *Robbins* v. *Department of Public Works,* 355 Mass. 328, 244 N.E.2d 577; *Gould* v. *Greylock Reservation Commission,* 350 Mass. 410, 215 N.E.2d 114; and *Commonwealth* v. *Massachusetts Turnpike Authority,* 346 Mass. 250, 191 N.E.2d 481. It is our conclusion, as we found in the *Stamos* case, that present statutes, including the Public Building Commission Act, authorize a plan such as that evolved for Washington Park presently, and we further find that the intention expressed in that legislation is sufficiently broad, comprehensive and definite to allow the diversion in use involved here.

In passing we think it appropriate to refer to the approach developed by the courts of our sister State, Wisconsin, in dealing with diversion problems. In at least two cases, *City of Madison* v. *State,* 1 Wis.2d 252, 83 N.W.2d 674; and *State* v. *Public Service Com.,* 275 Wis. 112, 81 N.W.2d 71, the Supreme Court of Wisconsin approved proposed diversions in the use of public trust lands under conditions which demonstrated (1) that public bodies would control use of the area in question, (2) that the area would be devoted to public purposes and open to the public, (3) the diminution of the area of original use would be small compared with the entire area, (4) that none of the public uses of the original area would be destroyed or greatly impaired and (5) that the disappointment of those wanting to use the area of new use for former purposes was negligible when

compared to the greater convenience to be afforded those members of the public using the new facility. We believe that the present plans for Washington Park meet all of these tests. While not controlling under the issues as presented in this case we believe that standards such as these might serve as a useful guide for future administrative action.

We believe that most of the remaining questions raised by plaintiffs have been dealt with and decided, either directly or by necessary inference, in our opinion in the *Stamos* case but we shall endeavor to cover all of them as briefly as possible. First, it is contended here as it was in *Stamos* that the Board of Education of the City of Chicago is not authorized to lease schoolhouse space from the Building Commission. We refer to p. 182 of our former opinion in answer to this argument. We adhere to our former position for the reasons there given. We have considered the authorities cited by plaintiffs and find that they are not productive of a contrary result. Second, it is said that the Chicago Park District cannot lease land from the Building Commission for any purposes except those related to its administrative functions. This argument was likewise made in *Stamos* and there answered at pps. 185-186. We adhere to our position as stated therein. Third, it is claimed that the Chicago Park District cannot donate cash or land and the Chicago Board of Education cannot donate cash to the Public Building Commission for the construction of a building and auxiliary facilities which neither is authorized to lease. It will be noted that this contention is based on the assumption that neither the board nor district can lease. Since, as decided above, both are authorized to lease, there is no basis for this contention. Further, it was specifically decided in *Stamos,* p. 186, that the Chicago Park District was authorized to contribute property for the purposes specified. We adhere to that decision. The power to donate under section 13 of the Public Building Commission Act, (Ill. Rev. Stat. 1967, ch. 85, par. 1043,) is broad. That sec-

tion confers power to donate property or cash on municipal corporations "which may be desirous of renting space in any building or buildings to be acquired or constructed by such Public Buildings Commission * * * in such amount or amounts as they may deem proper and appropriate in aiding the Public Building Commission to effectuate the purpose for its creation". Fourth, plaintiffs say that the twenty-year obligations for rental payments and for payments for maintenance and operation which defendants' scheme contemplates will be undertaken by the Chicago Board of Education and the Chicago Park District in violation of their annual appropriation requirements and their respective tax limits. This entire argument is met and answered at pps. 183-185 in our opinion in *Stamos*. We re-adopt that language and reasoning.

Finally, plaintiffs challenge the Public Building Commission Act on the ground that it is vague and indefinite and therefore unconstitutional. The first part of their argument concerns the phrase "essential governmental, health, safety and welfare services" in section 14(c). It is said that it is impossible to determine the scope of such services. This argument was considered specifically in *Stamos* at pps. 174-177 and the conclusion was that the legislative standards contained in the Public Building Commission Act are more than sufficient to satisfy the requirements of the due-process clauses of the State and Federal constitutions and article III of the Illinois constitution. We also had occasion in *Stamos* to observe (p. 176) that this court had used the precise word "essential" in sustaining the constitutionality of the original Public Building Commission Act in *People ex rel. Adamowski v. Public Building Com.*, 11 Ill.2d 125 at 131.

Plaintiffs' second contention as to vagueness comes in connection with section 14(i). That section authorizes a public building commission to "rent such space in such building or buildings as from time to time may not be needed

by any governmental agency for such other purposes as the Board of Commissioners may determine will best serve the comfort and convenience of the occupants of such building or buildings, and upon such terms and in such manner as the Board of Commissioners may determine". Plaintiffs fear that this section does not serve as a sufficient guide to determine what shall be done in case the Board of Education abandons the building when for one reason or another it becomes no longer useful for their purposes. It seems to us that the section in question is designed specifically to cover such a situation. It is true that administrative problems may arise in the event of damage by fire or other casualty but those are problems incident to the management of any building and it would not be expected that the legislature would attempt to anticipate and solve in advance every problem that might be encountered by the commission. As we observed in *Stamos* in referring to *Hill* v. *Relyea*, 34 Ill.2d 552, 555: "There is a distinction between the delegation of true legislative power and the delegation to a subordinate of authority to execute the law. [Citation.] The former involves a discretion as to what the law shall be; the latter is merely an authority or discretion as to its execution, to be exercised under and in pursuance of the law. [Citations.] It is an established rule that the General Assembly cannot delegate its general legislative power to determine what the law shall be. However, it may delegate to others the authority to do those things which the legislature might properly do, but cannot do as understandingly or advantageously. [Citations.] Absolute criteria whereby every detail necessary in the enforcement of a law is anticipated need not be established by the General Assembly. The constitution merely requires that intelligible standards be set to guide the agency charged with enforcement, [citations,] and the precision of the permissible standard must necessarily vary according to the nature of the ultimate objective and the problems involved. [Citations.]" We believe

that the section in question, when considered in connection with the other provisions of the act, cannot be said to involve an unconstitutional delegation of legislative power. No extended discussion is required to distinguish this case from *Rosemont Bldg. Supply, Inc.* v. *Illinois Highway Trust Authority*, 45 Ill.2d 243, relied upon by plaintiffs. The only similarity in the two cases is that problems of alleged vagueness and indefiniteness are involved. As remarked above, the "precision of the permissible standard must necessarily vary according to the nature of the ultimate objective and the problems involved." In *Rosemont* the authority was given its choice between rental to others or the collection of tolls in the event of nonpayment of rentals without specification of any toll authority or method. This was clearly an unconstitutional delegation.

In conclusion, let it be said that this court is fully aware of the fact that the issues presented in this case illustrate the classic struggle between those members of the public who would preserve our parks and open lands in their pristine purity and those charged with administrative responsibilities who, under the pressures of the changing needs of an increasingly complex society, find it necessary, in good faith and for the public good, to encroach to some extent upon lands heretofore considered inviolate to change. The resolution of this conflict in any given case is for the legislature and not the courts. The courts can serve only as an instrument of determining legislative intent as evidenced by existing legislation measured against constitutional limitations. In this process the courts must deal with legislation as enacted and not with speculative considerations of legislative wisdom. As previously indicated in this opinion, existing legislation does not warrant the restrictive interpretation plaintiffs would place upon it.

The judgment of the circuit court of Cook County dismissing plaintiffs' complaint is affirmed.