Docket No. 93852–Agenda 17–November 2002.

FRIENDS OF THE PARKS 
et al.
, Appellants, v. THE

 CHICAGO PARK DISTRICT 
et al.
, Appellees.

Opinion filed February 21, 2003.

JUSTICE KILBRIDE delivered the opinion of the court:

Plaintiffs, Friends of the Parks, together with 11 individual members of that organization and the Landmarks Preservation Council of Illinois, sued the Chicago Park District (Park District), the Illinois Sports Facilities Authority (Authority), the Chicago Bears Football Club, Inc. (Bears), the Chicago Bears Stadium L.L.C. (Stadium), and the City of Chicago (City) seeking a declaratory judgment that section 3 of the Illinois Sports Facilities Authority Act (Act) (70 ILCS 3205/1 
et seq. 
(West 2000)), as amended by Public Act 91–0935, eff. June 1, 2001, is unconstitutional. Defendants filed a motion to dismiss, alleging, 
inter alia
, that plaintiffs lacked standing to challenge the legislation. The trial court dismissed all but two counts of plaintiffs’ complaint and, subsequently, granted defendants’ motion for summary judgment. Plaintiffs appealed pursuant to Supreme Court Rule 301 (155 Ill. 2d R. 301). We granted leave to appeal directly to this court pursuant to Supreme Court Rule 302(b) (134 Ill. 2d R. 302(b)) and granted leave to Openlands Project to file a brief as 
amicus curiae
 (see 155 Ill. 2d R. 345). The only issues for our determination are whether the legislation: (1) violates the requirement in article VIII, section 1(a), of the Illinois Constitution that public funds, property or credit shall be used only for public purposes (see Ill. Const. 1970, art. VIII, §1(a)); (2) violates the public trust doctrine; and (3) was enacted in violation of the three-readings requirement in article IV, section 8(d), of the Illinois Constitution (see Ill. Const. 1970, art. IV, §8(d)). We answer all three questions in the negative and affirm the judgment of the trial court.

I. BACKGROUND

Section 3 of the Act is essentially enabling legislation permitting the public financing of physical improvements to Burnham Park, including Soldier Field on Chicago’s lakefront. Soldier Field occupies land that once was navigable water of Lake Michigan. It was opened as Municipal Grant Park Stadium in 1924 and has, since that time, been used for a variety of public events, including professional boxing matches, high school and college football games, professional soccer matches, tennis tournaments, religious convocations and, since 1971, Chicago Bears football games. From that year until 1980, the Bears used the field on game days under a series of annual and biannual permit use agreements. The Bears and the Park District entered into a long term lease in 1980, expiring in 2000.

The Act created the Illinois Sports Facilities Authority and authorized it to finance, construct, own, and operate sports facilities in the City of Chicago, including baseball and football stadiums. The Act contains the following findings:

“It is hereby found that as a result of deteriorating infrastructure and sports facilities in the metropolitan area of Chicago, there is a shortage of facilities suitable for use by professional and other sports teams and musical, theatrical, cultural, and other social organizations.

It is further found that as a result of the costs to maintain, repair or replace such infrastructure and facilities, and as a result of current high financing costs, the private sector, without the assistance contemplated in this Act, is unable to construct feasibly adequate sports facilities.

It is further found that the creation of modern sports facilities and the other results contemplated by this Act would stimulate economic activity in the State of Illinois, including the creation and maintenance of jobs, the creation of new and lasting infrastructure and other improvements, and the attraction and retention of sports and entertainment events which generate economic activity.

It is further found that professional sports facilities can be magnets for substantial interstate tourism resulting in increased retail sales, hotel and restaurant sales, and entertainment industry sales, all of which increase jobs and economic growth.

It is further found that only three major league professional baseball franchises play in stadium facilities the construction of which has not been government-assisted and of those three the most recently constructed facility was completed in 1914.” 70 ILCS 3205/3 (West 2000) (as amended by Pub. Act 91–0935, eff. June 1, 2001).

Under the Act, the Authority received revenue from hotel taxes, and this revenue funded payments on bonds issued by the Authority to finance the construction of the new Comiskey Park. In the year 2000, when tax revenues exceeded the amount necessary for the Authority to fulfill its obligations to Comiskey Park, the Bears, in conjunction with the National Football League (NFL), offered to commit $200 million to a project to improve Soldier Field. In response to the Bears’ offer, the legislature amended the Act to include the following additional legislative findings:

“It is further found that government assistance was or is an essential component in the financing of the construction of most recently built or planned National Football League stadiums.

It is further found that the exercise by the Authority and governmental owners of the additional powers conferred by this amendatory Act of the 91st General Assembly (i) will materially assist the development and redevelopment of government owned sports facilities and thereby alleviate in part the deleterious conditions and confer the public benefits described in this Section and (ii) is in the public interest and is declared to be for public purposes.” 70 ILCS 3205/3 (West 2000) (as amended by Pub. Act 91–0935, eff. June 1, 2001).

Other amendments to the Act authorized the Authority to issue $399 million in bonds (70 ILCS 3205/13(G) (West 2000) (as amended by Pub. Act 91–0935, eff. June 1, 2001)) and to enter into contracts for implementation of an improvement project. Specifically, the Authority was authorized to enter into an “[a]ssistance [a]greement” with a “governmental owner” of a “facility” as defined in the Act. 70 ILCS 3205/2(E), 8(11) (West 2000) (as amended by Pub. Act 91–0935, eff. June 1, 2001). Under the Act, a “governmental owner” includes a unit of local government, such as the Park District, “that owns or is to own a facility located within the corporate limits of the Authority *** and to which the Authority provides financial assistance.” 70 ILCS 3205/2(C) (West 2000) (as amended by Pub. Act 91–0935, eff. June 1, 2001).

The enabling legislation also amends the Chicago Park District Act to allow the Park District to enter into an “assistance agreement” with respect to any “facility” owned by the Park District. 70 ILCS 1505/15d(1) (West 2000). The Park District is also authorized to enter into a lease, license, or agreement with a sports team or involving a “facility” upon such terms and conditions as may be determined by the Park District. 70 ILCS 1505/15d(2) (West 2000).

The Authority, the Park District, the Bears, and the Stadium, as the developer, then entered into a series of agreements to accomplish a general project for the improvement of 97 acres of lakefront land owned by the Park District, surrounding Soldier Field, generally known as Burnham Park. The Authority issued its project certificate describing the scope of the project. Among other objectives, the Authority sought to: (1) adapt and reconstruct Soldier Field, and (2) construct an underground parking structure and a two-story above-ground parking structure and reconstruct a surface parking lot south of Soldier Field for use by the public, including patrons of Soldier Field, the museums, and other lakefront venues.

The terms and conditions of the project are set out principally in three separate agreements. In the “Burnham Park Development Agreement,” the Park District, as owner, expressly approves various construction agreements entered into by the Stadium with the Park District’s consent. In the “Development Assistance Agreement,” the Park District, in conjunction with the Authority, contracts with the Bears to have the Stadium complete the design and construct the project in accordance with the Burnham Park development agreement. Finally, the “Permit and Operating Agreement” executed by the Park District, the Bears, and the Stadium sets forth the terms and conditions for the Bears’ use of the renovated Soldier Field and certain surrounding areas.

Under the terms of the agreements, the Bears are designated as the primary sports user of the facility during the professional football season. They are entitled to use Soldier Field on game days as well as six times in a calendar year for club-related events. During the football season, the field itself is not to be used by any party, including the Park District and the Bears, for the five days preceding a game day. Upon written request, the Bears may use such other portions of the facility as the Park District may consent to in the exercise of its reasonable discretion. This right is limited to 34 events, related to the Bears and its sponsors, each year in addition to NFL game days, and is subject to previously scheduled events and the Park District’s specifically reserved use rights. The permit agreement expires in the year 2033. Subject to certain limitations, the Bears have the option to extend the term for four additional five-year periods.

In their motion for summary judgment, plaintiffs argued that the terms of the permit agreement disproportionately favor the Bears over the Park District, especially when compared with the terms of the prior lease. They argued that, contrary to the statement of public purpose announced by the legislature, the Act overwhelmingly benefitted a private interest, rather than serving the declared public objectives announced in the Act. The motion was supported by an affidavit of a University of Chicago economics professor, consisting principally of a refutation of the legislature’s findings that a new sports stadium, constructed largely with public financing, would serve its announced purposes. The trial court considered the affidavit, found it to be irrelevant, and denied plaintiffs’ motion. The trial court granted the defendants’ motion for summary judgment because it was precluded from inquiring into the merits or accuracy of the legislative findings.

II. ANALYSIS

Taken with the case was defendants’ motion to strike the statement of facts in plaintiffs’ brief for failure to comply with Supreme Court Rule 341(e)(6) (134 Ill. 2d R. 341(e)(6)). That rule requires that facts necessary to an understanding of the case be “stated accurately and fairly without argument or comment.” Although we believe the plaintiffs’ recitation of the facts to be generally accurate, it is certainly argumentative and in violation of the rule. While we decline to strike the plaintiffs’ factual summary, we admonish counsel to be mindful in the future of the requirement to eschew argument.

Turning to the substance of the appeal, the decision to grant or deny a motion for summary judgment or a motion to dismiss is reviewed 
de novo
. 
Outboard Marine Corp. v. Liberty Mutual Insurance Co.
, 154 Ill. 2d 90, 102 (1992) (summary judgment); 
Board of Managers of the Village Centre Condominium Ass’n, Inc. v. Wilmette Partners
, 198 Ill. 2d 132, 137 (2001) (motion to dismiss). The applicable standard for reviewing legislative enactments was articulated in 
In re Marriage of Lappe
, 176 Ill. 2d 414 (1997). In 
Lappe
, the trial court found certain sections of the Public Aid Code unconstitutional on their face. 
Lappe
, 176 Ill. 2d at 421. We began our analysis by observing:

“It is well established that legislative enactments enjoy a heavy presumption of constitutionality. [Citations.] The party challenging the constitutionality of a statue has the burden of clearly establishing its invalidity. [Citations.] Courts have a duty to sustain legislation whenever possible and resolve all doubts in favor of constitutional validity. [Citations.]” 
Lappe
, 176 Ill. 2d at 422.

A. Public Purpose

Applying this standard to the legislation in question, this court in 
Lappe
 rejected the argument that the challenged provisions did not serve a public purpose. 
Lappe
, 176 Ill. 2d at 429. We further stated:

“This court has long recognized that what is for the public good and what are public purposes are questions which the legislature must in the first instance decide. [Citations.] In making this determination, the legislature is vested with a broad discretion, and the judgment of the legislature is to be accepted in the absence of a clear showing that the purported public purpose is but an evasion and that the purpose is, in fact, private. [Citations.] In the words of Justice Holmes, ‘a declaration by a legislature concerning public conditions that by necessity and duty it must know, is entitled at least to great respect.’ [Citation.]

*** What is a ‘public purpose’ is not a static concept, but is flexible and capable of expansion to meet the changing conditions of a complex society. [Citations.] Moreover, ‘ “[t]he power of the State to expend public moneys for public purposes is not to be limited, alone, to the narrow lines of necessity, but the principles of wise statesmanship demand that those things which subserve the general wellbeing [
sic
] of society and the happiness and prosperity of the people shall meet the consideration of the legislative body of the State, though they ofttimes call for the expenditure of public money.” ’ [Citation.] The consensus of modern legislative and judicial thinking is to broaden the scope of activities which may be classified as involving a public purpose. [Citation.]” 
Lappe
, 176 Ill. 2d at 429-31.

Applying these principles, we held in 
Lappe
 that our inquiry was limited to examining whether the legislature’s determination was constitutionally permissible. 
Lappe
, 176 Ill. 2d at 436. This court found no constitutional basis for overturning the judgment of the legislature, recognizing that “ ‘[t]he execution of a public purpose which involves the expenditure of money is usually attended with private benefits.’ ” 
Lappe
, 176 Ill. 2d at 436-37, quoting 
Hagler v. Small
, 307 Ill. 460, 473 (1923). We further reasoned that, if the principal purpose of the enactment is public in nature, it is not relevant that there will be an incidental benefit to private interests. 
Lappe
, 176 Ill. 2d at 437.

Thus, the standards established in 
Lappe
 require us to defer to the legislative findings announced in the Act unless the plaintiffs make a threshold showing that the findings are evasive and that the purpose of the legislation is principally to benefit private interests. In view of Soldier Field’s long history of hosting events that have incidentally benefitted private interests, such as college and professional football games, professional boxing, professional soccer, horse shows, rodeos, and circuses, and because the same rationale used by the legislature as authority to construct and finance Comiskey Park is employed to establish the public purpose of the Soldier Field project authorized by the Act, we can discern no evasive or deceptive purpose in the legislature’s findings. In this regard, we note that, because Burnham Park was not dedicated to a particular use or purpose, it is within the province of the legislature to determine its use. 
Fairbank v. Stratton
, 14 Ill. 2d 307, 318 (1958).

The legislature identified that there was a shortage of suitable sports facilities in metropolitan Chicago and that the private sector, due to economic concerns, was unable to construct “feasibly adequate” sports facilities. The legislature then found that the creation of modern sports facilities would confer public benefits by stimulating economic activity in the Sate of Illinois, including the creation and maintenance of jobs, the creation of new infrastructure and other improvements, and the retention of sports and entertainment events, all generating economic activity. 70 ILCS 3205/3 (West 2000).

In section 3 of the Act, the legislature found that the exercise of the additional powers it was conferring would materially assist the development and redevelopment of government-owned sports facilities (such as Soldier Field) and would alleviate in part the deleterious conditions, and confer the public benefits, described in the 1987 version of the Act. Thus, the exercise of those powers was declared to be for public purposes. 70 ILCS 3205/3 (West 2000) (as amended by Pub. Act 91–0935, eff. June 1, 2001).

Plaintiffs argue that this legislative declaration is not controlling, relying on our holding in 
Southwestern Illinois Development Authority v. National City Environmental, L.L.C.
, 199 Ill. 2d 225 (2002). In that case, we affirmed an appellate court ruling that the development authority exceeded the bounds of its statutory right to exercise eminent domain powers. In the underlying “quick-take” proceedings, the trial court found that the taking was for a public purpose because it would remedy some public safety issues and confer some economic benefit to the community. We held that, despite those findings, the project was “a private venture designed to result not in a public use, but in private profits.” 
Southwestern Illinois Development Authority
, 199 Ill. 2d at 238-39.

Further, the facts in that case render it inapposite to the case before us. There, the development authority used its statutory power of eminent domain to take real estate from one private party in order to transfer the land to another private party to facilitate construction of a parking garage after the failure of negotiations for a private sale. Here, there has been no eminent domain taking, nor is one contemplated. The facial challenge to the Act presents us only with the question of whether, after according great deference to the legislative declaration of a public purpose, the stated public purpose is but an evasion.

Contrary to the suggestion of the special concurrence, our holding is not a retreat from our analysis in 
Southwestern Illinois Development Authority
. Unlike 
Southwestern Illinois Development Authority
, here the Park District is not attempting to use its unique powers of eminent domain to transfer land from one private owner to another. Burnham Park and Soldier Field are public facilities already owned and operated by the Chicago Park District. No private property interests are at issue in this case. For this reason alone, the two cases are readily distinguishable. Moreover, for the reasons we have discussed, the improvements to Burnham Park and Soldier Field benefit the members of the public who are served by the District as well as incidentally benefitting the Bears. Despite the special concurrence’s implication to the contrary, 
Southwestern Illinois Development Authority
 does not stand for the proposition that the requirement of an admission fee necessarily eliminates all public benefit. The requirement of an admission charge is only one factor that we examined in deciding 
Southwestern Illinois Development Authority
. The benefit to the public is not inherently diminished by the payment of an admission charge. The mere existence of admission charges to public facilities, such as the museums and attractions in Burnham Park, as well as the stadium and parking facilities, does not impair the right of citizens to enjoy the use of public property.

In addition, the private beneficiary of the condemnation in 
Southwestern Illinois Development Authority
 sought to acquire by eminent domain what it could not favorably acquire in open market negotiations. As we said in that case, the evidence established that “members of the public are not the primary intended beneficiaries of this taking. [Citation.] This condemnation clearly was intended to assist Gateway in accomplishing their goals in a swift, economical, and profitable manner.” 
Southwestern Illinois Development Authority
, 199 Ill. 2d at 240. Here, the evidence does not support a similar conclusion.

Additionally, other cases inform our public purpose inquiry. In 
People ex rel. City of Canton v. Crouch
, 79 Ill. 2d 356 (1980), this court found that the stated purpose of the Real Property Tax Increment Allocation Redevelopment Act (Ill. Rev Stat. 1977, ch. 24, par. 11–74.4–2, now codified at 65 ILCS 5/11–74.4–2 (West 2000)) of “promoting the public purpose of the State in reducing unemployment, relieving urban blight and increasing the general tax base” was within the ambit of the public purpose doctrine and, therefore, constitutional. 
Canton
, 79 Ill. 2d at 366, 369. Thus, this court affirmed a summary grant of 
mandamus
 compelling the mayor to execute general obligation bonds to finance a tax increment financing project authorized by municipal ordinance. 
Canton
, 79 Ill. 2d at 378. In doing so, we found that factual issues presented by the record, such as the value and issue date of the bonds and the possibility of the contracts of various taxing districts, were not material to the constitutionality of the legislation. 
Canton
, 79 Ill. 2d at 377.

We reached a similar result in 
People ex rel. City of Urbana v. Paley
, 68 Ill. 2d 62 (1977), finding valid a city ordinance authorizing the issuance of municipal bonds to finance the acquisition of a parcel of land as part of an urban development program. The ordinance was upheld against a public purpose challenge that it principally benefitted a private developer. This court noted that the purpose of the project was “clearly and predominantly a public purpose, and the benefit reaped by private developers is merely an inevitable incident thereto.” 
Urbana
, 68 Ill. 2d at 76.

It is historically clear that Soldier Field has served public purposes since its dedication in 1924. It will continue to do so after the completion of the Burnham Park project as authorized by the Act. A financial benefit accruing to the Bears, standing alone, does not diminish the fact that the renovated Soldier Field will be used and enjoyed by the public for a wide variety of public purposes, whether or not the projected positive effects on jobs and the local economy generally result as predicted by the legislature. Therefore, we hold that the Act does not violate the terms of article VIII, section 1(a), of the Illinois Constitution of 1970 (Ill. Const. 1970, art. VIII, §1(a)).

B. Public Trust

Plaintiffs also argue that the Act violates the public trust doctrine because it allows a private party (the Bears) to use and control Soldier Field for its primary benefit with no corresponding public benefit. All parties agree that Burnham Park, including Soldier Field, is public trust property.

The United States Supreme Court announced the public trust doctrine in 
Illinois Central R.R. Co. v. Illinois
, 146 U.S. 387, 36 L. Ed. 1018, 13 S. Ct. 110 (1892). In 1869, the Illinois legislature had granted the railroad, in fee simple, title to over 1,000 acres of submerged land extending into Lake Michigan about one mile from a portion of Chicago’s shoreline and had authorized the railroad to operate a rail line over the property. 
Illinois Central
, 146 U.S. at 444, 36 L. Ed. at 1039, 13 S. Ct. at 115. After the railroad improved the property and commenced operations, the legislature repealed the enabling legislation and revoked the original grant. The United States Supreme Court rejected the railroad’s challenge to the State’s action, holding that a state may not abdicate its obligation to preserve its navigable waters for the use of the public. The Court stated:

“The trust devolving upon the State for the public, and which can only be discharged by the management and control of property in which the public has an interest, cannot be relinquished by a transfer of the property.” 
Illinois Central
, 146 U.S. at 453, 36 L. Ed. at 1042, 13 S. Ct. at 118.

Illinois Central 
involved the conveyance of public trust property to a private party. The doctrine was applied by this court to a similar transfer in 
People ex rel. Scott v. Chicago Park District
, 66 Ill. 2d 65 (1976). In that case, the Illinois Attorney General brought a declaratory judgment action asking the court to declare an act of the legislature void because it allowed a transfer of land in violation of the public trust doctrine. The act authorized the sale of submerged lands owned by the Chicago Park District to the United States Steel Corporation to allow the construction of an additional facility extending the company’s South Works Plant some 194 acres into Lake Michigan. The enabling legislation declared that:

“ ‘[T]he grant of submerged land contained in this Act is made in aid of commerce and will create no impairment of the public interest in the lands and waters remaining, but will instead result in the conversion of otherwise useless and unproductive submerged land into an important commercial development to the benefit of the people of the State of Illinois.’ ” 
Scott
, 66 Ill. 2d at 80.

The court observed that the waters over the submerged lands were adjacent to waters presently in important public use and it could not be said that the irretrievable loss of those waters would not adversely affect the public use of the adjacent waters. 
Scott
, 66 Ill. 2d at 79-80. Despite the legislative declaration, the court could only perceive a private purpose for the grant. 
Scott
, 66 Ill. 2d at 79-80. Thus, the court found that the act violated the public trust doctrine. 
Scott
, 66 Ill. 2d at 80.

There is little similarity between 
Illinois Central
 or 
Scott 
and the case before us. The Park District is, and will remain, the owner of the Burnham Park property, including Soldier Field. Neither the Act, the implementing agreements, nor the project documents provide for a conveyance of the Soldier Field property to the Bears. There is no abdication of control of the property to the Bears. The Park District will continue in its previous capacity as landlord under a lease agreement with the Bears and will continue in its existing role as owner of the remainder of the Burnham Park property.

Plaintiffs argue, however, that this court’s decision in 
Paepcke v. Public Building Comm’n
, 46 Ill. 2d 330 (1970), establishes that the public trust doctrine may be applied even without an outright conveyance of the trust property. Although the opinion does suggest that a public trust challenge might be made on the basis that a diversion from the previously designated use of trust property is not justified unless certain standards are met, the court nevertheless affirmed the trial court’s dismissal of the plaintiffs’ challenge, holding that adequate legislative authorization existed to support the proposed changes, allowing the use of park property for school purposes. 
Paepcke
, 46 Ill. 2d at 342-45. In conclusion, the court stated:

“[T]he issues presented in this case illustrate the classic struggle between those members of the public who would preserve our parks and open lands in their pristine purity and those charged with administrative responsibilities who, under the pressures of the changing needs of an increasingly complex society, find it necessary, in good faith and for the public good, to encroach to some extent upon lands heretofore considered inviolate to change. The resolution of this conflict in any given case is for the legislature and not the courts. The courts can serve only as an instrument of determining legislative intent as evidenced by existing legislation measured against constitutional limitations. In this process the courts must deal with legislation as enacted and not with speculative considerations of legislative wisdom.” 
Paepcke
, 46 Ill. 2d at 347.

The rationale we used in 
Paepcke 
is equally applicable here. Further, we note that Soldier Field will continue to be used as a stadium for athletic, artistic, and cultural events. With improved parking, the public will gain better access to the stadium, the museums, and the lakefront generally. The public will now enjoy a fully renovated, multiuse stadium, instead of a deteriorating 78-year-old facility. These results do not violate the public trust doctrine even though the Bears will also benefit from the completed project.

C. Three-Readings

Lastly, plaintiffs argue that Public Act 91–0935 violates the three-readings requirement of the Illinois Constitution. The Constitution provides that a “bill shall be read by title on three different days in each house.” Ill. Const. 1970, art. IV, §8(d). Plaintiffs argue that the legislature did not follow this procedure, and therefore we should invalidate the Act.

Illinois follows the enrolled-bill doctrine. 
People v. Dunigan
, 165 Ill. 2d 235, 253-54 (1995); 
Cutinello v. Whitley
, 161 Ill. 2d 409, 424 (1994); 
Geja’s Cafe v. Metropolitan Pier & Exposition Authority
, 153 Ill. 2d 239, 259 (1992). This doctrine provides that once the Speaker of the House of Representatives and the President of the Senate certify that the procedural requirements for passing a bill have been met, a bill is conclusively presumed to have met all procedural requirements for passage. 
Dunigan
, 165 Ill. 2d at 253-54; 
Cutinello
, 161 Ill. 2d at 424, quoting 
Geja’s Cafe
, 153 Ill. 2d at 259. Under this precedent, we will not invalidate legislation on the basis of the three-readings requirement if the legislation has been certified. In this case, plaintiffs acknowledge that Public Act 91–0935 was certified, thus precluding judicial review.

We noted in 
Geja’s Cafe
 and again in 
Cutinello
 that the legislature had shown remarkably poor self-discipline in policing itself in regard to the three-readings requirement. 
Geja’s Cafe
, 153 Ill. 2d at 260; 
Cutinello
, 161 Ill. 2d at 425. The same poor self-discipline is alleged to have occurred in this case. The record below has not, however, been sufficiently developed to support or contradict this claim. Nevertheless, because this court is ever mindful of its duty to enforce the constitution of this state, we take the opportunity to urge the legislature to follow the three-readings rule. While separation of powers concerns militate in favor of the enrolled-bill doctrine (see 
Cutinello
, 161 Ill. 2d at 425), our responsibility to ensure obedience to the constitution remains an equally important concern.

III. CONCLUSION

In sum, we hold that section 3 of the Illinois Sport Facility Act violates neither the public purpose doctrine nor the public trust doctrine and that Public Act 91–0935 is not subject to procedural challenge in light of the enrolled-bill doctrine. We therefore affirm the circuit court’s grant of summary judgment in favor of defendants.

Judgment affirmed.

JUSTICE THOMAS took no part in the consideration or decision of this case.

JUSTICE FREEMAN, specially concurring:

I concur in the majority opinion. I write separately, however, to note that the majority opinion cannot be reconciled with the requirement advanced in 
Southwestern Illinois Development Authority v. National City Environmental, L.L.C.
, 199 Ill. 2d 225 (2002), that the public be entitled to use or enjoy the facilities of a development project as of right and not as a mere favor or by permission of the owner.

In 
Southwestern Illinois Development Authority
, 199 Ill. 2d at 235, the majority recognized that the state, as a sovereign, has the inherent right to condemn property, subject to the constitutional mandate that private property may not be taken or damaged for public use without just compensation to the owner. Further, the majority recognized that the subsequent transfer of property to a private entity does not transform a taking for public use into a taking for private use. See 
Southwestern Illinois Development Authority
, 199 Ill. 2d at 235. The majority correctly cited 
Hawaii Housing Authority v. Midkiff
, 467 U.S. 229, 81 L. Ed. 2d 186, 104 S. Ct. 2321 (1984), and 
Berman v. Parker
, 348 U.S. 26, 99 L. Ed. 27, 75 S. Ct. 98 (1954), for these propositions. See 
Southwestern Illinois Development Authority
, 199 Ill. 2d at 235-36. However, contrary to the holdings of 
Hawaii Housing Authority
 and 
Berman
, the majority gave little deference to the legislature’s public purpose determination. Instead, the majority engrafted upon 
Hawaii Housing Authority
 and 
Berman
 a requirement that property taken for a development project be put into use for the public as of right, a proposition specifically rejected by the Court in 
Hawaii Housing Authority
. See 
Hawaii Housing Authority
, 467 U.S. at 243-44, 81 L. Ed. 2d at 199, 104 S. Ct. at 2331. The majority explained:

“As this court held in 
Gaylord
 [
v. Sanitary District
], 204 Ill. at 584 ‘[t]he public must be to some extent entitled to use or enjoy the property, not as a mere favor or by permission of the owner, but by right.’

***

If this taking were allowed to stand, it may be true that spectators at Gateway would benefit greatly. Developing additional parking could benefit the members of the public who choose to attend events at the racetrack, as spectators may often have to wait in long lines of traffic to park their vehicles and again to depart the facility. We also acknowledge that a public use or purpose may be satisfied in light of public safety concerns. [Citation.] The public is allowed to park on the property in exchange for the payment of a fee. Gateway’s racetrack may be open to the public, but not ‘by right.’ [Citation.] It is a private venture designed to result not in a public use, but in private profits.” 
Southwestern Illinois Development Authority
, 199 Ill. 2d at 238-39.

The 
Southwestern Illinois Development Authority
 majority concluded that the taking was for a private use and not a public use. 
Southwestern Illinois Development Authority
, 199 Ill. 2d at 242. In so concluding, the majority failed to give due consideration to the findings of the Authority and the St. Clair County board that expansion of the Gateway racetrack would enhance the public health and safety of the citizens of southwestern Illinois and would increase the general welfare by generating economic growth in the area. The majority also failed to give due consideration to the uncontested testimony in the circuit court that expansion of the racetrack would eliminate blight, alleviate traffic safety problems and promote economic development in the area. The majority eschewed these findings and the uncontested evidence adduced at trial, in favor of its stated rule that “ ‘to constitute a public use, something more than a mere benefit to the public must flow from the contemplated improvement’ ” the public must have access to the facility as of right. See 
Southwestern Illinois Development Authority
, 199 Ill. 2d at 243 (Freeman, J., dissenting, joined by McMorrow, J.)

In the case at bar, the legislature amended the Illinois Sports Facilities Authority Act (70 ILCS 3205/1 
et seq
. (West 2000)) to authorize the Illinois Sports Facilities Authority to issue $399 million in bonds and enter into contracts for the implementation of an improvement project relating to Burnham Park. Specifically, the Act authorized the Facilities Authority to enter into an assistance agreement with the Chicago Park District, the governmental owner of Burnham Park for the renovation of the park. The Facilities Authority, the Park District, the Chicago Bears Football Club, Inc., and the Chicago Bears Stadium L.L.C., the developer of the project, entered into a series of agreements for the improvement of Burnham Park, including the reconstruction of Soldier Field. The bond issue is to be repaid from revenues the Facilities Authority receives from hotel taxes. See 70 ILCS 3205/19 (West 2000). Thus, the legislature authorized the use of public funds for the improvement of Burnham Park and reconstruction of the stadium.

Under the terms of the agreements, the Bears are designated as the primary sports user of Soldier Field during the professional football season. The Bears are entitled to use the stadium on game days as well as six times in a calendar year. During the football season, the field is not to be used by any party, including the Park District, for the five days preceding a game day. The Bears may also request the use of the stadium for up to 34 events each year. The Bears’ lease agreement is scheduled to end in 2033, subject to the Bears’ option to extend the term of the agreement for four additional five-year periods.

The plaintiffs at bar argue, 
inter alia
, that the Act violates the requirement in article VIII, section 1(a), of the Illinois Constitution that public funds, property or credit shall be used only for public purposes. Ill. Const. 1970, art. VIII, §1(a). They also argue that the Act violates the public trust doctrine because it allows a private entity, the Bears, to use and control the stadium for its primary benefit, with no corresponding public benefit. The majority disagrees. It holds that the Act does not violate either the constitutional requirement that public funds be used only for public purposes or the public trust doctrine. In so holding, the majority, although it protests to the contrary, retreats from the requirement in 
Southwestern Illinois Development Authority
 that the public must be able to use the development project facilities as of right.

It is quite evident that the public is not “entitled” to the use of Soldier Field as of “right.” On game days, members of the public must pay a fee to view the Bears play at the stadium. The Park District itself cannot use the stadium for the five days preceding a game. Looking beyond the Bears, the stadium is used as a venue for the presentation of sporting events, concerts and other cultural events. In those instances also the public must pay an entrance fee. It is also evident that private parties such as the Bears benefit from the ability to charge an entrance fee to the public for the use of the stadium. The legislature, however, determined that there are public benefits from the development of sports arenas. As stated in the Act, “professional sports facilities can be magnets for substantial interstate tourism resulting in increased retail sales, hotel and restaurant sales, and entertainment industry sales, all of which increase jobs and economic growth.” 70 ILCS 3205/3 (West 2000).

The majority asserts that 
Southwestern Illinois Development Authority
 is distinguishable because the Authority there used the power of eminent domain to acquire the property at issue. This purported distinction is of no avail since the power of eminent domain, like the authority to issue the bonds in the present case, is but a means employed by the legislature to achieve the public purpose. Once the legislature has spoken regarding the public interests to be served, the means by which those interests are to be attained are also for the legislature to determine. See 
Berman
, 348 U.S. at 33-34, 99 L. Ed. at 38, 75 S. Ct. at 103.

I note that, while the majority attempts to distinguish 
Southwestern Illinois Development Authority
, the majority justifies its finding of a public purpose in the present case by reference to the financing and construction of Comiskey Park. The majority states:

“In view of Soldier Field’s long history of hosting events that have incidentally benefitted private interests, such as college and professional football games, professional boxing, professional soccer, horse shows, rodeos, and circuses, and because the same rationale used by the legislature as authority to construct and finance Comiskey Park is employed to establish the public purpose of the Soldier Field project authorized by the Act, we can discern no evasive or deceptive purpose in the legislature’s findings.” Slip op. at 8.

The legislature authorized the Illinois Sports Facilities Authority to use the power of eminent domain in the construction of Comiskey Park, including the construction of parking structures serving the stadium. See 70 ILCS 3205/2, 12 (West 2000).

In my dissent in 
Southwestern Illinois Development Authority
, I inquired of the majority

“what development project can satisfy the requirement that the public be ‘entitled to use or enjoy the property, not as a mere favor or by permission of the owner, but by right’? Can a member of the general public enter a manufacturing plant as of right? What of a sports facility? Can a member of the general public enter a stadium, or for that matter the racetrack at issue, without paying a fee for the privilege?” 
Southwestern Illinois Development Authority
, 199 Ill. 2d at 263 (Freeman, J., dissenting, joined by McMorrow, J.).

The answer to my inquiries is that the public is not entitled to use or enjoy the facilities of a development project as of right. In the present case, the majority notes that “[t]he benefit to the public is not inherently diminished by the payment of an admission charge.” Slip op. at 9. By this holding, the majority recognizes what it refused to acknowledge in 
Southwestern Illinois Development Authority
. It only remains for this court to explicitly overrule the “public entitlement” requirement advanced in 
Southwestern Illinois Development Authority
.

CHIEF JUSTICE McMORROW joins in this special concurrence.