In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

Nos. 19-2308 & 19-3333

PROTECT OUR PARKS, INC.,
and MARIA VALENCIA,

*Plaintiffs-Appellants*,

*v.*

CHICAGO PARK DISTRICT
and CITY OF CHICAGO,

*Defendants-Appellees*.

———————————

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:18-cv-3424 — **John Robert Blakey**, *Judge*.

———————————

ARGUED MAY 21, 2020 — DECIDED AUGUST 21, 2020

———————————

Before MANION, BARRETT, and BRENNAN, *Circuit Judges*.

BARRETT, *Circuit Judge*. This case is about the plaintiffs'
quest to halt construction of the Obama Presidential Center in
Chicago's Jackson Park. First developed as the site for the Chi-
cago World's Fair in 1893, Jackson Park has a storied place in
Chicago history, and as public land, it must remain dedicated
to a public purpose. The City made the judgment that hosting

a center devoted to the achievements of America's first African-American President, who has a longstanding connection to Chicago, fit that bill. Vehemently disagreeing, the plaintiffs sued the City of Chicago and the Chicago Park District to stop the project. They brought a host of federal and state claims, all asserting variants of the theory that the Obama Presidential Center does not serve the public interest but rather the private interest of its sponsor, the Barack Obama Foundation.

The district court granted summary judgment to the defendants across the board, and the plaintiffs appeal. We affirm the district court's judgment as to the federal claims, but we hold that it should have dismissed the state claims for lack of jurisdiction. Federal courts are only permitted to adjudicate claims that have allegedly caused the plaintiff a concrete injury; a plaintiff cannot come to federal court simply to air a generalized policy grievance. The federal claims allege a concrete injury, albeit one that, as it turns out, the law does not recognize. The state claims, however, allege only policy disagreements with Chicago and the Park District, so neither we nor the district court has jurisdiction to decide them.

I.

In 2014, the Barack Obama Foundation began a nationwide search for the future location of the presidential library for the 44th President. Eventually, the Foundation selected Jackson Park on Chicago's South Side to house the Obama Presidential Center. The City of Chicago acquired the 19.3 acres necessary from the Chicago Park District, enacted the ordinances required to approve the construction of the Center, and entered into a use agreement with the Obama Foundation to govern the terms of the Center's construction, ownership, and operation. The Jackson Park location, the

Foundation believed, would be best situated to "attract visitors on a national and global level" and would "bring significant long term benefits to the South Side."

But construction of the Center will require the removal of multiple mature trees, as well as the closure and diversion of roadways. It will also require the City to shoulder a number of big-ticket expenses. Unhappy with the environmental and financial impact of the project, the group Protect Our Parks and several individual Chicago residents sued both the City and the Park District to halt construction of the Center.

The plaintiffs raised four claims that are relevant here. First and foremost, they claimed that the defendants violated Illinois's public trust doctrine. Briefly stated, the public trust doctrine limits the government's ability to transfer control or ownership of public lands to private parties. The plaintiffs argued that the City violated the doctrine by transferring control of public parkland to the Obama Foundation for a purely private purpose.

Next, the plaintiffs claimed that under Illinois law, the defendants acted ultra vires—in layman's terms, beyond their legal authority—in entering the use agreement with the Foundation. Specifically, the plaintiffs maintained that the use agreement between the City and the Foundation violates Illinois law because, among other things, it delegates decision-making authority to the Foundation, grants the Foundation an illegal lease in all but name, 70 ILCS 1290/1, exchanges the property for less than equal value, 70 ILCS 1205/10-7(b), and fails to require the City to "use, occupy, or improve" the land transferred to it from the Park District, 50 ILCS 605/2.

The plaintiffs' final two claims arise under federal law. They argued that, by altering the use of Jackson Park and handing over control to the Foundation, the defendants took the plaintiffs' property for a private purpose in violation of the Takings Clause of the Fifth Amendment. In the same vein, the plaintiffs asserted that the defendants deprived them of property in a process so lacking in procedural safeguards that it amounted to a rubberstamp of the Foundation's decision and violated their rights under the Due Process Clause of the Fourteenth Amendment.

The district court granted summary judgment to the City and the Park District on all four of these claims, and the plaintiffs appealed from that decision. While the first appeal was pending, the federal government issued a provisional report about the potential effects of the project, including its effects on the environment. The plaintiffs then moved for relief from the judgment under Federal Rule of Civil Procedure 60(b), alleging that the report was new, material evidence that undermined the district court's decision. The district court denied the motion, and the plaintiffs appealed again. We consolidated the two appeals.

II.

We'll start with the plaintiffs' appeal from the district court's grant of summary judgment on the state law claims. Before we can address the merits, though, we have "an obligation to assure ourselves" of our jurisdiction. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 340 (2006) (citation omitted). And jurisdiction—specifically, the plaintiffs' standing to bring their state claims in federal court—proves to be a problem here. We asked the parties to address this issue in supplemental briefing, and while both the plaintiffs and the

defendants assure us that the plaintiffs have standing, we aren't convinced.

The requirement of standing "is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Its elements are familiar: "the plaintiff must allege an injury in fact that is traceable to the defendant's conduct and redressable by a favorable judicial decision." *Casillas v. Madison Ave. Assocs., Inc.*, 926 F.3d 329, 333 (7th Cir. 2019). The first requirement—injury in fact—is "the '[f]irst and foremost' of standing's three elements." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (alteration in original) (citation omitted). It requires a plaintiff to demonstrate that she "suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 1548 (quoting *Lujan*, 504 U.S. at 560). The parties insist that the plaintiffs have adequately alleged that they will suffer an imminent, concrete injury as a result of the defendants' alleged violations of Illinois law.

To understand the arguments that the parties make to support this point, one must first understand the public trust doctrine, which is the basis of the plaintiffs' primary state law claim. Here's the nutshell version: the public trust doctrine, established in American law by *Illinois Central Railroad Co. v. Illinois*, prohibits a state from alienating its interest in public lands submerged beneath navigable waterways to a private party for private purposes. 146 U.S. 387, 455–56 (1892). Instead, a state may only alienate publicly owned submerged land to a private party if the property will be "used in promoting the interests of the public" or "can be disposed of

without any substantial impairment of the public interest in the lands and waters remaining." *Id.* at 453.

In the time since *Illinois Central*, some states, including Illinois, have applied the doctrine to land other than navigable waterways—which is important here because Jackson Park is not a navigable waterway. In fact, despite the doctrine's underwater origins, most of the recent Illinois cases deal with dry land. *See Friends of the Parks v. Chi. Park Dist.*, 786 N.E.2d 161, 169–70 (Ill. 2003) (applying the doctrine to Chicago's Soldier Field, built on parkland reclaimed from Lake Michigan); *Paepcke v. Pub. Bldg. Comm'n of Chi.*, 263 N.E.2d 11, 15–16 (Ill. 1970) (applying the doctrine to Chicago's Washington and Douglas parks); *Fairbank v. Stratton*, 152 N.E.2d 569, 575 (Ill. 1958) (applying the doctrine to the reclaimed land that now houses Chicago's McCormick Place convention center). Once such land has been dedicated to a public purpose, the Illinois Supreme Court has explained, the government "hold[s] the properties in trust for the uses and purposes specified and for the benefit of the public." *Paepcke*, 263 N.E.2d at 15. Dedication to a public purpose isn't an "irrevocable commitment[]," *id.* at 16, and judicial review of any reallocation is deferential, particularly if the land in question has never been submerged. Nonetheless, the doctrine requires courts to ensure that the legislature has made a "sufficient manifestation of legislative intent to permit the diversion and reallocation" to a more restrictive, less public use. *Id.* at 18.

In this case, the plaintiffs argue that the defendants' use agreement with the Obama Foundation violates the public trust doctrine because it transfers control of public land in Jackson Park to the private Foundation for a purely private purpose. And, drawing an analogy to private trust law, they

argue that the transaction could not have been in the public interest because it was inconsistent with the defendants' "fiduciary duties." In their telling, the public trust calls for heightened scrutiny of a transaction if it was "tainted by self-dealing, favoritism or conflicts of interest." They argue that the use agreement here fits that description for many reasons, including that the City negotiated with the Obama Foundation under the leadership of Mayor Rahm Emmanuel, who, as President Obama's former chief of staff, was eager to give the Foundation a sweetheart deal.

The parties offer three reasons why the plaintiffs have adequately alleged an injury in fact stemming from these alleged violations of state law. (While their focus is on the public trust doctrine, their arguments also apply to the plaintiffs' allegation that the City and Park District violated the statutes regulating the management of public land.) First, the plaintiffs assert that they have standing in federal court because their injury would be recognized in Illinois state court. Second, the plaintiffs suggest that they have standing to stop injury to Jackson Park. And finally, the defendants—though notably, not the plaintiffs themselves—argue that the plaintiffs have standing as municipal taxpayers. We address each argument in turn.

## A.

Illinois courts have long recognized the public's injury from a violation of the public trust doctrine as sufficient to create a justiciable controversy. *See Paepcke*, 263 N.E.2d at 18. Thus, the plaintiffs insist, they have suffered a sufficient injury in fact to establish their standing in federal court. In other words, the plaintiffs claim that the existence of a justiciable

controversy in state court demonstrates that there is one in federal court too.

The plaintiffs misapprehend the doctrine of standing, which is a corollary of Article III's limitation of the "judicial power" to the resolution of "cases" and "controversies." U.S. CONST. art. III, § 2, cl. 1 (capitalization omitted). The requirement limits the power of *federal* courts and is a matter of *federal* law. It does not turn on state law, which obviously cannot alter the scope of the federal judicial power. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 804 (1985) (asserting that standing in federal court "does not depend on [a] party's … standing in state court"). At the same time, federal law does not dictate the scope of state judicial power. Article III does not apply to the states, so "state courts are not bound by the limitations of a case or controversy or other federal rules of justiciability." *ASARCO, Inc. v. Kadish*, 490 U.S. 605, 617 (1989). Unencumbered by these limitations, the states can empower their courts to hear cases that federal courts cannot—and many states have done just that. *See, e.g.*, F. Andrew Hessick, *Cases, Controversies, and Diversity*, 109 NW. U. L. REV. 57, 65–75 (2014) (cataloguing the variations between federal justiciability doctrines and those in state courts); JEFFREY S. SUTTON ET AL., STATE CONSTITUTIONAL LAW: THE MODERN EXPERIENCE 790–816 (3d ed. 2020) (excerpting examples from state court decisions).

This case presents a prime example. The Illinois Supreme Court has specifically held that a plaintiff can bring suit under the public trust doctrine without showing that she "will suffer special damage, different in degree and kind from that suffered by the public at large." *Paepcke*, 263 N.E.2d at 18; *see id.* (overruling the prior, contrary rule). Instead, the Illinois

Supreme Court said, "If the 'public trust' doctrine is to have any meaning or vitality at all, the members of the public, at least taxpayers who are the beneficiaries of [the public] trust, must have the right and standing to enforce it." *Id.* In other words, Illinois has adopted precisely the *opposite* of the injury-in-fact requirement of federal standing, which demands that every plaintiff prove that he "seek[s] relief for an injury that affects him in a 'personal and individual way.'" *Hollingsworth v. Perry*, 570 U.S. 693, 705 (2013) (citation omitted); *see also Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615, 1621 (2020) ("[T]he 'assumption that if respondents have no standing to sue, no one would have standing, is not a reason to find standing.'" (quoting *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 489 (1982))).

While Illinois is free to conclude that "plaintiffs' rights as residents in a trust of public lands" may be "enforced without question," *Paepcke*, 263 N.E.2d at 18, Article III doesn't give us the same leeway. To sue in federal court, a plaintiff must also demonstrate an injury to her "separate concrete interest."[1] *Lujan*, 504 U.S. at 572. The plaintiffs have failed to do that here: their public trust and ultra vires claims each allege only that the government has failed to follow the law. All residents of

---

[1] We note that the plaintiffs did not allege the kind of concrete injury that many plaintiffs bringing environmental challenges do: "that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000) (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)). That kind of injury is cognizable under Article III. *Id.*; *see also Lujan*, 504 U.S. at 562–63 ("Of course, the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purposes of standing."). The plaintiffs, however, made no such claim.

Chicago—indeed, advocates for good government every-where—desire that the government follow the law. But recognizing standing based on such an "undifferentiated" injury is fundamentally "inconsistent" with the exercise of the judicial power. *Id.* at 575; *see also Hollingsworth*, 133 S. Ct. at 2662 ("[A] 'generalized grievance,' no matter how sincere, is insufficient to confer standing."); *Valley Forge Christian Coll.*, 454 U.S. at 482–83. For Article III purposes, the plaintiffs are nothing more than "concerned bystanders," and concerned bystanders are not entitled to press their claims in federal court. *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 687 (1973). The fact that Illinois would permit them to do so in state court is irrelevant to the Article III inquiry.

B.

The plaintiffs have an alternative argument: they argue that they have standing because Jackson Park will suffer an injury in fact as a result of the defendants' violations of state law. On this theory, the City's plan to turn part of Jackson Park into the Obama Presidential Center will cause irreparable "damage to Jackson Park" that is "fairly traceable to the construction project." The alleged damage includes, for example, departing from Frederick Law Olmsted's original plan for the landscape of Jackson Park and jeopardizing the Park's listing on the National Register of Historic Places.

But this argument fares no better than the last. Even if the Obama Presidential Center will damage Jackson Park, "[t]he relevant showing for purposes of Article III standing … is not injury to the environment but injury to the plaintiff." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). The plaintiffs can't repackage an injury to the

park as an injury to themselves. Nor can they sue on behalf of the park, which is what they seem to be trying to do. In limited circumstances, the doctrine of "third-party standing" permits a plaintiff to sue to vindicate the rights of someone else. *See, e.g.*, *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004) (noting that the "Court has allowed standing to litigate the rights of third parties when enforcement of the challenged restriction against the litigant would result indirectly in the violation of third parties' rights" (emphasis and citation omitted)). Here, though, the plaintiffs are trying to raise the rights of *something* else. Among the many problems with this maneuver is the fact that Jackson Park has no rights of its own to assert. *Cf.* ECUADOR CONST. tit. II, ch. 7, art. 71 (granting rights to nature).

## C.

Finally, the defendants—but, notably, not the plaintiffs—argue that the plaintiffs have standing as municipal taxpayers of the City of Chicago.[2] The defendants took precisely the

---

[2] The defendants vaguely argue that "among the plaintiffs … are Chicago taxpayers." We take their argument to refer to plaintiff Maria Valencia, the only individual plaintiff remaining in the case. The record reflects that Valencia is a resident and taxpayer of the City of Chicago. But the record is silent as to Protect Our Parks—though as a nonprofit group, it presumably is not a municipal taxpayer. As an organization, then, Protect Our Parks would only have standing to the extent that "its members would otherwise have standing to sue in their own right." *Friends of the Earth*, 528 U.S. at 181. But the record is silent, too, on the group's membership. We thus proceed on the understanding that the municipal taxpayer standing argument hinges on Valencia. *See Chi. Joe's Tea Room, LLC v. Village of Broadview*, 894 F.3d 807, 813 (7th Cir. 2018) (noting that Article III is satisfied if "there is at least one individual plaintiff who has demonstrated standing" (citation omitted)).

opposite position in the district court, where they raised the plaintiffs' lack of municipal taxpayer standing as one reason why the district court should dismiss the state-law claims on jurisdictional grounds. In response, the plaintiffs asserted that they had municipal taxpayer standing, and the district court accepted that argument.

Things have changed on appeal. The plaintiffs' supplemental brief doesn't even mention municipal taxpayer standing, while the defendants now champion it as the basis for jurisdiction. It is not obvious why the plaintiffs have failed to embrace a district court decision in their favor, but the reason for the defendants' change of heart is easy to see—having secured a judgment on the merits, they'd prefer an affirmance to a dismissal. Still, the defendants were right the first time around: municipal taxpayer standing does not justify federal jurisdiction over these state-law claims.

Municipal taxpayer standing is a bit of a relic in the modern landscape of standing. It derives from *Crampton v. Zabriskie*, in which the Supreme Court held that "there is at this day no serious question" about "the right of resident tax-payers to invoke the interposition of a court of equity to prevent an illegal disposition of the moneys of the county or the illegal creation of a debt which they in common with other property-holders of the county may otherwise be compelled to pay." 101 U.S. 601, 609 (1879). The Court cited *Crampton* approvingly a half-century later in *Frothingham v. Mellon*, which rejected the proposition that standing to sue the federal government could be based merely on a plaintiff's status as a federal taxpayer. 262 U.S. 447, 487–88 (1923). En route to that holding, the Court distinguished between municipal taxpayers, who have a "peculiar relation … to the [municipal] corporation,

which is not without some resemblance to that subsisting between stockholder and private corporation," and federal taxpayers, any one of whom shares her "interest in the moneys of the treasury … with millions of others." *Id.* at 487. It thus left undisturbed "the rule, frequently stated by this court, that resident taxpayers may sue to enjoin an illegal use of the moneys of a municipal corporation." *Id.* at 486.

The rule remains undisturbed, but it has grown increasingly anomalous. *Smith v. Jefferson Cty. Bd. of Sch. Comm'rs*, 641 F.3d 197, 221–23 (6th Cir. 2011) (en banc) (Sutton, J., concurring) ("While the municipal-taxpayer standing doctrine has stood still, … standing principles have moved on."). Although the Court has not actually relied on municipal taxpayer standing in decades, it has continued to assume the doctrine's validity. *See, e.g., DaimlerChrysler*, 547 U.S. at 349. Meanwhile, it has developed a substantial body of law vigorously enforcing the principle that injuries cognizable under Article III cannot be "generalized," *Lujan*, 504 U.S. at 575–76, "undifferentiated," *United States v. Richardson*, 418 U.S. 166, 177 (1974), or insufficiently "particularized," *Spokeo*, 136 S. Ct. at 1548. It has also repeatedly emphasized that neither state nor federal taxpayers can satisfy this standard in a suit against the government for the illegal expenditure of taxpayer funds.[3]

---

[3] Since *Frothingham*, the Court has only acknowledged standing for federal taxpayers in one substantive area—Establishment Clause cases. *See Flast v. Cohen*, 392 U.S. 83, 102–04 (1968). Even then, it has been reluctant to find *Flast*'s requirements satisfied. *See, e.g., Hein v. Freedom from Religion Found., Inc.*, 551 U.S. 587, 593 (2007) (plurality opinion) (denying federal taxpayer standing in an Establishment Clause challenge because the allegedly illegal expenditures were made from general executive branch appropriations rather than specific congressional appropriations); *Valley*

*See DaimlerChrysler*, 547 U.S. at 345. Yet it has never explained why municipal taxpayers are differently situated—and it might find that difficult to do. *Frothingham* suggested that the city or county resident has a "peculiar relationship" with her local government, while the state or federal citizen has only a "minute" or "remote" tie to hers. 262 U.S. at 487. Maybe that's true in Grover's Corners. *See* THORNTON WILDER, OUR TOWN (1938). But why is a suit brought by one of Chicago's 2.6 million residents any more particularized than a suit by any of the 579,000 citizens of Wyoming? *QuickFacts*, U.S. CENSUS BUREAU, https://www.census.gov/quickfacts/fact/table/WY,c hicagocityillinois/PST045219 (last visited Aug. 20, 2020).

There's reason to think that the Court has recognized this reality—at least one opinion has hinted that municipal taxpayer standing should be brought into line with modern standing doctrine. *ASARCO*, 490 U.S. at 613 (plurality opinion) ("We have indicated that the same conclusion *may not hold* for municipal taxpayers, *if it has been shown* that the 'peculiar relation of the corporate taxpayer to the municipal corporation' makes the taxpayer's interest in the application of municipal revenues '*direct and immediate*.'" (emphasis added)). But undertaking that task is the Court's job, not ours. *See Agostini v. Felton*, 521 U.S. 203, 237 (1997) (explaining that lower courts are not free to "conclude [that] more recent cases have, by implication, overruled an earlier precedent" but must instead "follow [a] case which directly controls" (citation and internal quotation marks omitted)). So, in analyzing whether the plaintiffs' injury is cognizable, we will not ask whether it is concrete and particularized. Instead, we will ask

---

*Forge Christian Coll.*, 454 U.S. at 479–80 (denying federal taxpayer standing in an Establishment Clause challenge to executive action).

only whether the elements of municipal taxpayer standing have been satisfied.

Municipal taxpayer standing has two threshold requirements. First, and most obviously, the plaintiff must actually be a taxpayer of the municipality that she wishes to sue. *Freedom from Religion Found., Inc. v. Zielke*, 845 F.2d 1463, 1470 (7th Cir. 1988). Second, the plaintiff must establish that the municipality has spent tax revenues on the allegedly illegal action. *Id.* The second requirement comes from the Supreme Court's decision in *Doremus v. Board of Education*, which requires a plaintiff to show that "the taxpayer's action … is a good-faith pocketbook action." 342 U.S. 429, 434 (1952). The plaintiff must be able to show that she has "the requisite financial interest that is, or is threatened to be, injured by" the municipality's illegal conduct. *Id.* at 435.

The burden of establishing standing is on the plaintiffs. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 411–12 (2013). As we've already mentioned, though, the plaintiffs aren't the ones who have invoked municipal taxpayer standing—the defendants are. And despite their support of this theory now, the defendants' earlier argument against it was better. As the defendants told the district court, the record doesn't support the conclusion that the plaintiffs have suffered a direct pocketbook injury from the conversion of part of Jackson Park into the campus of the Obama Presidential Center. That is so for several reasons.

For one thing, a plaintiff who asserts municipal taxpayer standing "must show that the municipality has actually expended funds *on the allegedly illegal elements* of the disputed practice." *Nichols v. City of Rehoboth Beach*, 836 F.3d 275, 282 (3d Cir. 2016) (emphasis added). Here, the plaintiffs argue

that the "allegedly illegal elements"—which is to say, the elements of the defendants' actions that violate the public trust doctrine—are the construction and operation of the Obama Presidential Center. But the Obama Foundation—not the City—will bear the project's costs. The City's agreement with the Foundation provides that the cost of initially constructing the Center, of operating the Center once it is built, and of maintaining the Center going forward will all be the Foundation's responsibility. Thus, no tax dollars will be spent to build or operate the Center. And "if no tax money is spent on the allegedly [illegal] activity," then "[a] plaintiff's status as a municipal taxpayer is irrelevant for standing purposes." *Freedom from Religion Found.*, 845 F.2d at 1470.

To be sure, the City is set to spend millions of dollars to prepare the Jackson Park site for construction of the Center, even though it isn't paying for the Center itself. Specifically, the City will pay for three projects: alteration and rerouting of roadways, including removing Cornell Drive and converting the roadway into parkland; environmental remediation and utilities work; and construction of athletic facilities. But the plaintiffs have not claimed that those three projects themselves violate the public trust doctrine or are otherwise beyond the City's power to undertake. That means that those projects cannot be the allegedly offending elements of the defendants' actions, which in turn means that the City's spending on those projects is beside the point for municipal taxpayer standing. *Cf. Gonzales v. North Township*, 4 F.3d 1412, 1416 (7th Cir. 1993) (rejecting municipal taxpayer standing to challenge the display of a crucifix in a public park because the city did not pay to acquire, display, or maintain the crucifix itself). If the allegedly illegal conduct is the construction and operation of the Center, and taxpayer dollars aren't being

spent on that conduct, then that alone is enough to defeat the plaintiffs' municipal taxpayer standing.

But even if we accepted that the City-funded projects are relevant, there is yet another problem—there has been no showing that the City will pay for those projects with municipal taxes. *See Amnesty Int'l USA*, 568 U.S. at 411–12 (noting that "at the summary judgment stage," a plaintiff "can no longer rest on … 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts'" supporting standing (citation omitted)). It is not enough to simply allege that the City is spending money; the existence of municipal taxpayer standing depends on where the money comes from. The parties fail to grapple with the possibility that the relevant funds come from a source other than tax dollars. And that possibility isn't remote—nearly a third of the City's revenue comes from nontax sources. *See* CITY OF CHICAGO, 2020 BUDGET OVERVIEW 38, https://www.chicago.gov/content/dam/city/depts/obm/supp_info/2020Budget/2020BudgetOverview.pdf (last visited Aug. 20, 2020) (noting that 32.9% of the City's budget was derived from nontax revenue). These nontax sources are as varied as licensing fees, parking tickets, concessions contracts, and federal and state grants. *Id.* at 37–38 (cataloguing the sources of city revenue); *id.* at 48 (noting that the City received $1.66 billion in grants during its 2019 fiscal year and projecting that grants will account for 14% of the budget for the 2020 fiscal year). It would be far too simplistic to conclude that the City is spending *tax* money on a project simply because it is spending *some* money on a project.

Municipal taxpayers have standing to sue only when they have both identified an action on the city's part that is allegedly illegal and adequately shown that city tax dollars will be

spent on that illegal activity. *See Cantrell v. City of Long Beach*, 241 F.3d 674, 683–84 (9th Cir. 2001). Here, neither prong is satisfied. Thus, the plaintiffs' status as municipal taxpayers is insufficient to confer Article III standing.

III.

We now turn to the plaintiffs' two federal claims: that the defendants took their property in violation of the Fifth and Fourteenth Amendments. *See* U.S. CONST. amend. V ("[P]rivate property [shall not] be taken for public use, without just compensation."); U.S. CONST. amend. XIV, § 1, cl. 3 ("[N]or shall any State deprive any person of … property, without due process of law."). Neither of these claims can get off the ground unless the plaintiffs prove that they have a private property interest in Jackson Park. To accomplish that, the plaintiffs return to the public trust doctrine and add a twist: they argue that the public trust doctrine not only curtails a state's ability to transfer public land to a private party but also confers a private property right on members of the public. Analogizing to the law of trusts, the plaintiffs insist that they are "beneficiaries" of Jackson Park, which the defendants hold in trust on the public's behalf. And, according to the plaintiffs, this "beneficial interest" is private property that is protected by the United States Constitution.

Unlike the state claims, the federal claims do allege a cognizable injury: the deprivation of a property right. *See Warth v. Seldin*, 422 U.S. 490, 500 (1975) (explaining that standing "often turns on the nature and source of the claim asserted"). To be sure, the alleged property right—a beneficial interest in a public park—is highly unusual, and one might be immediately skeptical about whether it exists. But when the existence of a protected property interest is an element of the claim,

deciding whether the interest exists virtually always goes to the merits rather than standing. *Booker-El v. Superintendent, Ind. State Prison*, 668 F.3d 896, 900 (7th Cir. 2012) ("Were we to require more than a colorable claim [to a property interest], we would decide the merits of the case before satisfying ourselves of standing."). So, for example, in *Booker-El*, we held that a plaintiff had standing to assert a procedural due process claim against prison administrators for mismanaging a general recreation fund held for the benefit of inmates, even though we concluded, on the merits, that Indiana law did not give the plaintiff a protected property interest in the fund. *Id.* at 900–01.[4] As cases like *Booker-El* illustrate, it is not unusual for the distinction between standing and the merits to cause conceptual trouble when a plaintiff alleges the deprivation of a dubious property or liberty interest. *See id.* at 899 (noting that an argument that the plaintiff lacked standing because he lacked a protected property interest "conflates standing with the merits"); *cf. Matushkina v. Nielsen*, 877 F.3d 289, 292 (7th Cir. 2017) (noting that when a "plaintiff does not have a legal right enforceable in a federal court … it is not always obvious … whether the problem is a lack of standing or lack of a viable claim on the merits"). Yet as we have explained before, to say that a claim "is not worth anything" is a determination "that concerns the merits rather than … jurisdiction.

---

[4] In this case, the plaintiffs claim a shared property right, insofar as they claim that they, along with other members of the public, have a beneficial interest in Jackson Park. The mere fact that the alleged right is widely shared does not defeat standing. Being deprived of one's property is a concrete and particularized injury, even if the property is intangible or one's ownership is fractional. *See Spokeo*, 136 S. Ct. at 1548–49; *Warth*, 422 U.S. at 501 (noting that an injury can be "distinct and palpable … even if it is an injury shared by a large class of other possible litigants").

Otherwise every losing suit would be dismissed for lack of jurisdiction." *Owsley v. Gorbett*, 960 F.3d 969, 971 (7th Cir. 2020) (citation omitted).

And so we turn to the merits, which are easily dispatched. To show that they are similarly situated to beneficiaries of a private trust, the plaintiffs emphasize the word "trust" in "public trust doctrine" and quote cases describing public parkland as being held "in trust" and "for the benefit of the public." *Paepcke*, 263 N.E.2d at 15; *see also Ill. Cent.*, 146 U.S. at 452 (referring to the state's ownership of submerged land as "a title held in trust for the people of the state"). Their argument disintegrates, however, when one reads more than the snippets they cite. *Paepcke* is particularly devastating: in that case, the Illinois Supreme Court held that those owning land adjacent to or in the vicinity of a public park possess no private property right in having the parkland committed to a particular use. 263 N.E.2d at 16; *see also Petersen v. Chi. Plan Comm'n of City of Chi.*, 707 N.E.2d 150, 155 (Ill. App. Ct. 1998) (rejecting a procedural due process claim based on the expansion of the Museum of Science and Industry on the ground that the plaintiffs had no protectible property interest in Jackson Park). If adjacent landowners have no protected interest in public land, then the plaintiffs don't have one either. Although the plaintiffs wish it were otherwise, the Illinois cases make clear that the public trust doctrine functions as a restraint on government action, not as an affirmative grant of property rights.[5]

---

[5] And even if the doctrine conferred a property interest on members of the public, that interest would not necessarily qualify for protection under the Constitution. *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 757

The lack of a property interest is the most fundamental defect in both of the plaintiffs' federal claims, yet it is by no means the only one. With respect to the takings claim, the plaintiffs seek injunctive relief but not money damages. Although the plaintiffs don't spell out their argument, the request for injunctive relief suggests that their complaint is that the Center does not qualify as a "public use" rather than that the City has failed to pay them "just compensation." U.S. CONST. amend. V. This is a losing argument. Even assuming that the City's use agreement with the Foundation qualifies as a transfer to a private party, the Supreme Court held in *Kelo v. City of New London* that a transfer to a private owner can still be constitutional if it is done for a "public purpose." 545 U.S. 469, 483–84 (2005). What's more, the City's judgment that a particular transfer and use has a public purpose is entitled to deference. *Id.* at 488–89. It's hard to see, then, how we could "second-guess the City's determination[]" that building the Center—with its museum, public library branch, auditorium, athletic center, gardens, and more—is a use with public benefits. *Id.* at 488.

The plaintiffs' procedural due process claim also has problems beyond the lack of a protected property interest. For this claim to succeed, the plaintiffs must establish that the procedures they received fell short of minimum constitutional requirements, *Doe v. Purdue Univ.*, 928 F.3d 652, 659 (7th Cir. 2019), and the plaintiffs have failed to identify what greater process they were due. The City enacted four separate

---

(2005) ("Although the underlying substantive interest is created by 'an independent source such as state law,' *federal constitutional law* determines whether that interest rises to the level of a 'legitimate claim of entitlement' protected by the Due Process Clause." (citation omitted)).

ordinances approving various aspects of the Center. The votes on those ordinances came after multiple public hearings at which residents could raise their concerns about the City's intended plans. And the Illinois General Assembly amended the Illinois Park District Aquarium and Museum Act to explicitly authorize cities and park districts to erect, operate, and maintain "presidential libraries, centers, and museums" in public parks. 70 ILCS 1290/1. We have noted that a "legislative determination provides all the process that is due." *Dibble v. Quinn*, 793 F.3d 803, 809 (7th Cir. 2015) (citation omitted). If one legislative determination is enough, then *five* determinations are overkill.

In short, the plaintiffs' Fifth and Fourteenth Amendment claims fail on the merits, and we affirm the grant of summary judgment on both.

## IV.

We have one final bit of housekeeping. The plaintiffs also challenge the district court's denial of their motion for relief from the judgment under Federal Rule of Civil Procedure 60(b). Rule 60(b) permits a district court to grant "relief from a judgment or order" for a number of specified reasons. In their motion, the plaintiffs suggested two reasons why the district court should revisit its resolution of their public trust claim. First, the plaintiffs argued that "new and material evidence" had come to light. *See* FED. R. CIV. P. 60(b)(2). This argument was based on a provisional report completed by the National Park Service and the Federal Highway Administration as part of assessing whether federal roadway projects or other alterations connected to the construction of the Center would have an "adverse effect" on Jackson Park's listing on the National Register of Historic Places, *see* 54 U.S.C. § 306108;

36 C.F.R. § 800.5, or qualify as a "major federal action" subject to the National Environmental Policy Act, *see* 42 U.S.C. § 4332(C). And second, the plaintiffs argued that the continued application of the district court's judgment was inequitable. *See* FED. R. CIV. P. 60(b)(5).

As we've explained, however, the plaintiffs lack Article III standing to bring the public trust claim in the first place. That pulls the rug out from under their arguments in favor of Rule 60(b) relief. Whatever the merits of those arguments, both we and the district court lack jurisdiction to resolve the plaintiffs' public trust claim. That puts to rest any contention that the district court should have revisited its holding on that count. We thus affirm the denial of the motion, albeit on different grounds.

* * *

While we affirm the grant of summary judgment on the Fifth and Fourteenth Amendment claims, we vacate the grant of summary judgment on the public trust and ultra vires claims. We hold that the plaintiffs lack standing to bring those latter claims in federal court, and therefore that the district court should have dismissed them for lack of jurisdiction. We also affirm the denial of the motion for relief from the judgment under Rule 60(b).

The judgment is AFFIRMED in part and VACATED in part, and the case is REMANDED.